## HILL v. UNITED STATES.
### No. 4618.

District Court, D. Kansas,
First Division.

March 11, 1943.

Earl H. Hatcher, of Topeka, Kan. and Justin D. Bowersock, of Kansas City, Mo. (Bowersock, Fizzell & Rhodes, of Kansas City, Mo., of counsel), for plaintiff.

George H. West, U. S. Atty., of Kansas City, Kan., and Leon F. Cooper, Sp. Asst. to the Atty. Gen. (Samuel O. Clark, Jr., Asst. Atty. Gen., Andrew D. Sharpe, Sp. Asst. to the Atty. Gen., and Summerfield S. Alexander, U. S. Atty., of Topeka, Kan., on the brief), for defendant.

HOPKINS, District Judge.

The action is one brought by Irving Hill, surviving trustee of a trust which was formed at Lawrence, Kansas, wherein Irving Hill and Paul A. Dinsmoor were trustees, against the United States of America, to recover the sum of $13,216.87, with interest, which sum the Commissioner of Internal Revenue had required the two trustees to pay to the government as income taxes for the years 1936, 1937, and 1938, on the ground that the trust was an association and subject to pay an income tax as a corporation.

The greater part of the sum was for income taxes for 1937. The payments by the trustees were on the dates and in the amounts as follows:

| | |
|---|---:|
| July 6, 1940 | $ 550.36 |
| November 16, 1940 | 12,629.24 |
| November 22, 1940 | 37.27 |
| The total was | $13,216.87 |

The payments were made under protest, and the trustees asserted their trust was not subject to be taxed on its income, as an association, for those years.

The pertinent law involved is found in Title 26 U.S.C. 3797, 49 Stat. 1648, 26 U.S.C.A. Int.Rev.Code, § 3797, defining corporation and certain Treasury Regulations concerning trusts.

The defendant contends that those payments were lawfully required because the trust was to be treated as an association and that the income tax pertaining to associations was properly applied.

There was a stipulation on the facts.

Prior to August 1, 1931, the Lawrence Paper Manufacturing Company was a co-partnership, composed of Irving Hill, Paul A. Dinsmoor, Hortense B. Hill, Mary B. Dinsmoor, and a trust called the Mary G. Bowersock Trust, of which last named trust Justin D. Bowersock, Irving Hill, and Paul A. Dinsmoor were the trustees. The factory of the copartnership was located at Lawrence, Kansas, and it was employed in the business of making paper products. The assets consisted of operating equipment and property, and in addition other assets consisting principally of municipal and government bonds. These assets were jointly owned by the copartners in the following proportion: Irving Hill, one-fourth; Paul A. Dinsmoor, one-fourth; Hortense B. Hill, one-eighth; Mary B. Dinsmoor, one-eighth; and the Mary G. Bowersock Trust, one-fourth.

On or shortly before August 1, 1931, the partners formed a corporation to conduct the manufacturing business named the Lawrence Paper Company, and transferred to it the operating assets of the partnership.

. The remaining assets of the partnership, consisting principally of government and municipal bonds, were transferred to Irving Hill and Paul A. Dinsmoor, as trustees, under an agreement dated August 1, 1931, which was signed by each of the five partners and by Hill and Dinsmoor as trustees. That agreement was to run until May 1, 1936, subject to prior termination by the trustees on notice to the partners. It stated that the partners of said manufacturing business proposed to go out of business, that they had organized a corporation, which obviously was to carry on the business, "to which a portion of the assets of said partnership have been transferred, and it is now desired to provide for the liquidation and ultimate disposition and distribution of the assets of said partnership not so transferred, such assets being jointly owned by the undersigned in the proportions hereinafter stated."

There was next a statement that the undersigned, meaning the partners, transferred to the said trustees securities listed on a schedule attached "to hold the same in trust for the benefit of the undersigned" in proportions which were stated as above.

The next two paragraphs were as follows:

"The Trustees designated in this agreement shall have full power to invest and reinvest the joint funds in accordance with their best judgment, without being restricted to any class or classes of investments usually designated as legal investments for trustees and may in their discretion retain any securities or assets in which such fund or any part thereof may be now invested; to buy, acquire, sell and otherwise dispose of and deal with the joint funds and any part thereof, and any and all funds at any time coming within the terms hereof, at their sole discretion; to pay any and all taxes and other expenses in connection with the management of the joint funds; and to receive, collect, accumulate and distribute at their sole discretion the income from said joint funds.

"Without limiting the foregoing powers, the trustees are specifically authorized, so long as the stock ownership in The Lawrence Paper Company, being the corporation above referred to, shall remain in the undersigned in the proportions above stated, (except directors' qualifying shares), to lend to said Lawrence Paper Company, on such terms as the trustees may determine any and all of the joint funds from time to time, and may also make such contributions out of the joint funds as they may deem advisable to the capital structure of said corporation from time to time, such contributions being regarded for the purposes of this agreement as distributions

to the undersigned of the amounts so contributed."

After stating the term of the agreement, it was said: "Upon the termination hereof, either by lapse of time or by action of the trustees, all joint funds, including accumulations, if any, shall be distributed to the undersigned in the proportions hereinbefore stated."

Next, it was said:

"In the event of the death of either or both of the trustees, a successor or successors shall be chosen by the undersigned or their successors, a majority in interest having a controlling voice in such selection.

"The trustees shall act jointly in all matters pertaining to the joint funds, and shall be liable only for wilful default or misconduct."

The agreement was signed by all the partners and the trustees.

That agreement was modified and as changed was extended to May 1, 1941, by a second agreement of February 28, 1936, signed by the same parties. The changed provisions were as follows:

"Without limiting the foregoing powers, the trustees are specifically authorized to lend to said Lawrence Paper Company, on such terms as the trustees may determine, any and all of the joint funds from time to time, or to purchase its bonds with any or all of such funds; and may also make such contributions out of the joint funds as they may deem advisable to the capital structure of said corporation from time to time, either proportionally with all other common stockholders in accordance with a proper agreement for that purpose or by the purchase of preferred stock, such contributions being regarded for the purposes of this agreement as distributions to the undersigned of the amounts so contributed.

"It is further agreed that the last paragraph in said agreement shall be modified so as to read as follows:

"The trustees shall act jointly in all matters pertaining to the joint funds, and shall be liable only for wilful default or misconduct; provided, however, that, in order to provide expeditious means of properly consummating transfers, the title to industrial stocks and bonds may be taken in the name of either trustee individually, and such trustee in whose name such stocks and bonds may be held is authorized to transfer the same as an individual without reference to his trusteeship.

"It is further agreed that, as modified above, said agreement is hereby continued in force until May 1st, 1941, subject to all the other provisions, authorities and restrictions therein."

The trust began operations on August 1, 1931. On that date, the total of the assets of the partnership, which were transferred to the trustees, was $495,597.49. Of that total, government, municipal, and industrial bonds amounted to $456,239.99, and stocks in domestic corporations were $38,057.50.

After consideration of the subject, the trustees decided to reduce their holdings of bonds and to reinvest the proceeds in stocks, on the theory that in case of inflation stocks would be less diminished in value than bonds. The proposed change was gradually carried out. From time to time, some of the bonds matured. The holdings of stocks was gradually increased, so that by December 31, 1938, out of a total of assets of $466,218.28, the trust held $31,-784.30 in bonds and $415,957.90 in stocks of domestic corporations. On December 31, 1932, the total estimated value of the assets was $529,194.06.

During the period August 1, 1931, to December 31, 1938, the trust distributed to its beneficiaries out of its income the sum of $74,000.

The Standard Statistics Company, Inc., was a company with an office in the City of New York, which as a business, for compensation, furnished information and advice about investments to its subscribers. On July 25, 1934, the trustees became such a subscriber, and the agreement was to run for one year from that date. It was extended from time to time so that it ran at least to the end of 1938. The compensation from the trustees to the Standard Company was based on the amount of the assets, evidently taken at yearly intervals.

The Standard Company, while the agreement was in effect, furnished to the trustees frequently information and opinions bearing on the merit and values of many of the securities held by the trust and of other securities which the Standard Company stated would be desirable investments for the trust.

The trustees used these statements, acted on their own judgment, but often followed the advice of the Standard in selling and buying securities. Many of the securities thus bought were stocks in domestic corporations which were engaged in various lines of business. The information and

opinion of the Standard Company often gave facts tending to show that the securities held by the trustees, or which might be bought by them, were or were not of merit and value. The probable dividends from stocks were considered, and the present and probable future market price. At times, but not usually, the opportunity to sell stocks at a higher price than that of the purchase was mentioned. The Standard Company served with zeal.

During the period of those services the trustees made many sales of bonds and stocks from the trust assets and purchased some bonds and many stocks. Those sales and purchases were frequent and in the total of large amounts both of sales and purchases.

The elements mainly considered by the trustees in selling and buying stocks were: the safety and soundness of the stocks, their probable future dividends, and present and probable future market price.

There were no sales or purchases on a margin. There were few or no purchases with an expectation of a large gain.

The statute and regulations: It is provided in the Revenue Act of 1936, C. 690, 49 Stat. 1648, 26 U.S.C.A. Int.Rev. Acts, page 971:

"§ 1001. Definitions

"(a) When used in this Act—

"(1) The term 'person' means an individual, a trust or estate, a partnership, or a corporation.

"(2) The term 'corporation' includes associations, joint-stock companies, and insurance companies."

The Revenue Act of 1938, § 901, 26 U.S.C.A. Int.Rev. Acts, page 1161, uses the same language as that above.

The authority to promulgate regulations under Section 62 of the Act of 1936 is as follows: "The Commissioner, with the approval of the Secretary, shall prescribe and publish all needful rules and regulations for the enforcement of this Title [chapter]." 49 Stat. 1673, Section 62, 26 U.S.C.A. Int.Rev. Code, § 62.

The same language is used in the Act of 1938.

No. 94 of the Treasury Regulations, adopted by the Commissioner of Internal Revenue, under the Act of 1936, and approved by the Secretary of the Treasury, seeks to distinguish an association from a trust in the subdivisions (1) and (2) above, and is followed by Treasury Regulation No. 101, Art. 901-3, adopted under the Revenue Act of 1938.

The Regulation No. 94, Art. 1001-3, states: "Association distinguished from trust.—The term 'trust', as used in the Act, refers to an ordinary trust, namely, one created by will or by declaration of the trustees or the grantor, the trustees of which take title to the property for the purpose of protecting or conserving it as customarily required under the ordinary rules applied in chancery and probate courts. The beneficiaries of such a trust generally do no more than accept the benefits thereof and are not the voluntary planners or creators of the trust arrangement. Even though the beneficiaries do create such a trust, it is ordinarily done to conserve the trust property without undertaking any activity not strictly necessary to the attainment of the object."

That definition is not complete. It omits the usual element of an ordinary trust that the trustee should endeavor to obtain an income from the trust assets.

Next follows a long description of a business trust, the first part of which is as follows: "As distinguished from the ordinary trust described in the preceding paragraph is an arrangement whereby the legal title to the property is conveyed to trustees (or a trustee) who, under a declaration or agreement of trust, hold and manage the property with a view to income or profit for the benefit of beneficiaries. Such an arrangement is designed (whether expressly or otherwise) to afford a medium whereby an income or profit seeking activity may be carried on through a substitute for an organization such as a voluntary association or a joint stock company or a corporation, thus obtaining the advantages of those forms of organization without their disadvantages."

And in the next paragraph, it is said: "If a trust is an undertaking or arrangement conducted for income or profit * * * the beneficiaries are to be treated as voluntarily joining or cooperating with each other in the trust, just as do members of an association, and the undertaking or arrangement is deemed to be an association classified by the Act as a corporation. * * *"

At the close, it is said: "The distinction is that between the activity or purpose for which an ordinary strict trust of the traditional type would be created, and the ac-

tivity or purpose for which a corporation for profit might have been formed."

█ If these provisions in Regulation No. 94 should be construed to classify every trust out of which an income is earned as a business trust, it would be in conflict with the statute above quoted and with the practices of ordinary trusts. It can and should be construed as seeking to distinguish between an ordinary trust, which usually earns an income, and a business trust, the principal purpose of which is income or profit.

█ In ordinary trusts, there is the power or duty of the trustee to try, by the exercise of care, to make an income from the assets. That is incidental to the trust. 1 Restatement of the Law of Trusts, §§ 181, 627, 628; McKinney on Trust Investments, 2nd Ed., page 20; 1 Perry on Trusts, 7th Ed., § 452, page 753; § 468, n. 69, page 796, n. 74 and 72; 2 id. § 527, Note 31; 3 Bogert on Trusts and Trustees, §§ 611, 612; 3 Pomeroy's Equity Jurisprudence, 4th Ed., §§ 1071, 1072. And the same point in the like sections Vol. 4 of the 5th Ed.

█ And in addition the trustee may obtain information and advice as to investments from others who appear qualified to give the same. 1 Restatement of the Law of Trusts, § 227, pp. 645, 646, subdivision (b); 3 Bogert on Trusts and Trustees, § 612, p. 1941. The trustee may diversify the investments. 3 Bogert on Trusts and Trustees, § 612, p. 1943.

█ In Morrissey v. Commissioner of Internal Revenue, 296 U.S. 344, at page 356, 56 S.Ct. 289, 80 L.Ed. 263, the Court discusses the differences between an old style or ordinary trust and a business trust. The opinion explains that a business trust is where several persons enter upon a business enterprise for the purpose of gain.

There are provisions in the two trust agreements which authorize the trustees to financially aid the Lawrence Paper Company. The trustees have made loans to the Paper Company and have guaranteed some of its debts.

█ The action of the Commissioner of Internal Revenue was not based on the question of such aid. No issue was presented to the Court on that subject. Nothing in the evidence or stipulation required that the Court should consider and rule on that point. Aside from that, the agreement of August 1, 1931, provided for transferring from the partnership, which had conducted the business of making articles from paper, to the trustees, the assets which were finally to be distributed to the beneficiaries. The trustees were authorized to endeavor to make an income or accumulation from the assets and to distribute the same. An old style or ordinary trust was created by that agreement. Its purpose was to conserve assets for the beneficiaries to whom they were to be finally distributed. Income from the assets was desirable and was authorized, but was an incidental purpose. The law as to ordinary trusts permits and usually requires an effort by the trustee to earn an income from the assets.

The trustees had a right to obtain the help of the Standard Company in determining what securities to sell and what to buy.

They had a right to diversify their holdings, and so long as they used care and judgment it was within their discretion to change their holdings in order to benefit the assets.

The sales and purchases, the evidence shows, were with the object of having securities which were safe and sound and would probably yield as large an income as could be obtained from safe and sound investments. The law as to the duties of trustees of an ordinary trust does not prevent them from buying stocks which will probably advance in market price, or from selling stocks at a higher price than they paid for them. But transactions of the two later classes were but a small part of the total of the dealings by the trustees. Much the greater part took into account principally the soundness of the security and the probable income it would yield.

The evidence did not disclose that any serious risks were taken in selling or buying securities or that any high gain was sought. There were frequent attempts to maintain, or improve, the value of the assets and the income therefrom. Those attempts, evidently made carefully and in good faith, were within the discretion of the trustees of an ordinary trust.

This was an ordinary trust. The plaintiff has a right to recover on the basis of the amount paid by him as an association income tax set out in paragraph 14 of the Stipulation of Agreed Facts.

An appropriate order may be drawn entering judgment for the plaintiff against the defendant to recover the amounts claimed as stated in paragraph 14 of the Stipulation of Agreed Facts, with interest from the dates of the payments.